IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNETH FLECK et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TRUSTEES OF THE UNIVERSITY | : | NO. 12-3765 |
| OF PENNSYLVANIA et al. | : | |

MEMORANDUM

Dalzell, J.                                                      February 5, 2014

     Preachers Kenneth Fleck ("Fleck"), Michael Marcavage ("Marcavage") and three others bring this civil rights action pursuant to 42 U.S.C. §1983 against certain police officers of the University of Pennsylvania and Philadelphia Police Departments.[1]  Plaintiffs' claims arise from events of July 3 and August 22, 2010[2] after they began preaching outside a mosque in West Philadelphia near the University of Pennsylvania campus.

     Specifically, plaintiffs assert violations of their First Amendment free speech right, their Fourth Amendment right against unreasonable search and seizure, and the Due Process Clause. Plaintiffs Fleck and Marcavage also claim state-law violations for false arrest, false imprisonment and malicious prosecution against the named officers and both police departments. Finally, plaintiffs' undefined §1983 claim against the City of Philadelphia may be construed as a

---

[1] Defendants AlliedBarton Security Services LLC ("AlliedBarton") and individual AlliedBarton employees were dismissed from this action because they are not state actors and therefore cannot be sued under 42 U.S.C. §1983.  See Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009); see also February 20, 2013 Order and July 18, 2013 stipulation.

[2] Although the complaint alleges that the second incident occurred on August 23, 2010, the Philadelphia Police incident report is dated August 22, 2010.  City of Phila. MSJ, Ex. E. Plaintiffs concede the error.  Id. Ex. A at 174:6-12.

claim that the Philadelphia police officers' alleged constitutional violations were the result of a municipal policy, custom or practice pursuant to Monell v. Dept. of Social Services, 436 U.S. 658 (1978).[3]

Plaintiffs seek compensatory and punitive damages.  They also seek to enjoin defendants from suppressing religious speech in public forums.

Before us are unopposed motions for summary judgment from the Trustees of the University of Pennsylvania ("Penn") on behalf of the University and named Penn police officers, and from the City of Philadelphia (the "City"), for itself and the sole named Philadelphia police officer.

We draw our recitation of facts principally from the deposition transcripts the defendants provided, pursuant to Rule 56(c)(3), and state where the facts are undisputed.

## I.      Factual and Procedural Background

Plaintiffs are five Christian evangelists affiliated with Repent America, an organization Marcavage led.  Penn MSJ, Ex. A; see also Phila. MSJ, Ex. B at 13:1.  Marcavage and his affiliates engage in "open-air preaching", under often contentious circumstances, that have led to prior litigation in this District.   See, e.g. Marcavage v. City of Philadelphia, 778 F.Supp.2d 556 (E.D.Pa. 2011) (Robreno, J.), aff'd 481 Fed.Appx. 742 (3d Cir. 2012); Marcavage v. National Park Service, 777 F.Supp.2d 858 (E.D.Pa. 2011) (Bartle, C.J.), aff'd 666 F.3d 856 (3d Cir. 2012); United States v. Marcavage, 2009 WL 2170094 (E.D.Pa. Jul. 16, 2009) (Davis, J.), vacated by 609 F.3d 264 (3d Cir. 2010); Startzell v. City of Philadelphia, 2007 WL

---

[3] No similar claim against Penn survived our February 20, 2013 order because we dismissed all but the state claims against it.

172400 (E.D.Pa. Jan 18, 2007) (Stengel, J.), aff'd 533 F.3d 183 (3d Cir. 2008).[4]   But the

Marcavage group has also preached in this area without incident.   See Penn MSJ, Ex. B at 51:15-

19.

### A.   The Events of July 3, 2010

On the evening of July 3, 2010, Fleck, Marcavage and Michael Stockwell drove past the

Masjid Al Jamia Mosque at 4228 Walnut Street in Philadelphia.   Phila. MSJ, Ex. C at 48:11-14,

and Penn MSJ, Ex. C at 1.   Knowing the hour coincided with evening prayers at the mosque, the

plaintiffs decided to park the car and preach the gospel in front of the mosque.   Penn MSJ SOF

¶¶5-6; Phila. MSJ, Ex. C at 50:12-14, 53:5-6.   That night was family night at the mosque, and

there were between sixty and seventy people, including children, in attendance there.   Penn MSJ

SOF ¶7 and Ex. G at 1.   The area around the mosque is primarily residential.   Phila. MSJ, Ex. C

at 61:5-12.   Because they wanted to be effectively heard, they stationed themselves immediately

in front of the mosque door, where congregants were gathering, and began singing a hymn.   Id.

at 63:9-11, 78:1-3 and 101:13-15; Penn MSJ, Ex. B at 72:22-24 and Ex. E at 32:12.   Thereafter,

they took turns preaching.   Phila. MSJ, Ex. C at 64:20-21.

At about 9:00 p.m. a security guard employed by AlliedBarton was patrolling on her bike

near the northwest corner of 43rd and Walnut Streets, across the street from the mosque, when

she observed plaintiffs shouting in a hostile manner toward the people gathered in the mosque

doorway.   Penn MSJ, Ex. F at 7:14, 8:10-12, 9:1-10, 12:12-20.   Another AlliedBarton security

guard, Christopher Cochrane, arrived moments later and also observed the plaintiffs standing in

---

[4] Marcavage engages in similar litigation in other jurisdictions as well.

front of the mosque shouting that Islam is a hate religion.  <u>Id.</u>, Ex. F at 15:8-22 and Ex. H at 15:12-24.  Shortly thereafter, several men left the mosque and one of them began speaking to one of the plaintiffs, at first in a low tone, then progressively louder until it escalated into a loud confrontation.  <u>Id.</u>, Ex. F at 13:23-14:2.  Several men, women and children also came out of the mosque and gathered around the plaintiffs.  <u>Id.</u> at 14:11-13; <u>see also</u> Penn MSJ, Ex. G at 1.  Cochrane approached the plaintiffs and asked them to lower their voices or he would have to call the Penn police, to which plaintiffs responded that they did not care if he called the police because they had a free-speech right.  <u>Id.</u>, Ex. H at 17:22-18:3 and 18:9-10; <u>see also</u> <u>id.</u>, Ex. I.  Cochrane raised his voice to be heard because plaintiffs were shouting as loudly at him as they were to the congregants.  <u>Id.</u>, Ex. H at 26:15-24.  It is undisputed that plaintiffs did not lower their voices and Cochrane summoned Penn police officers to assist.  <u>Id.</u>, Ex. H at 18:14-16.

Penn police officers Gary Cooper and Nicole Michel drove up in a patrol car and observed a crowd forming and the plaintiffs exhorting congregants.  Penn MSJ SOF ¶24, Ex. I at 37:18-23, 38:15-18 and Ex. J at 35:13-17.  It is undisputed that the plaintiffs stood by the mosque's doorway, impeding traffic.  <u>Id.</u>, Ex. J at 34:18-19; Phila. MSJ, Ex. B at 103:1-3.  A crowd gathered outside the mosque doorway and another crowd formed across the street, where people were beginning to spill into the street.  Penn MSJ, Ex. I at 40:4-7, 39:17-20 and Ex. J at 37:10-12.  Some congregants threatened the plaintiffs.  Phila. MSJ, Ex. C at 93:17.

Emerging from the patrol car, Officer Cooper instructed plaintiffs to move down the street because the ruckus caused several crowds to gather.  Penn MSJ, Ex. J at 34:19-20 and 37:11-16.  Officer Cooper told the plaintiffs that they could continue their activity provided they moved down the street, did not block the entrance to the mosque and did not cause a disturbance.  <u>Id.</u> at 40:14-20.  The plaintiffs ignored the officer's instruction.  <u>Id.</u> at 37:11-16 and 40:14-23.

Officer Michel spoke to Fleck, who was exhorting the congregants from a position that blocked the mosque entrance, and instructed him that he needed to move up the street. Penn MSJ SOF ¶¶ 32-34; see also Ex. I and 41:23-44:11 and 44:7-14. Fleck, disregarding the officer's instruction, continued to yell in front of the mosque door. Id., Ex. I at 45: 5-8. Officer Michel turned her attention to Marcavage, also preaching loudly to the congregants, and asked him to lower his voice, which he refused to do. Id. at 45:10-46:5. Several of the small children present began to cry. Id. at 48:1-7.

In the course of this dialogue, Marcavage, who had been filming the preaching, began filming Officer Michel at close range with a handheld video camera that hung around his neck. Id. at 52:24-25 and 54:25-55:20; Phila. MSJ, Ex. B 103:4-105:12. When Marcavage held the camera less than a foot from the officer's face, she told him, "You need to put that down." Penn MSJ, Ex. I at 55:2-17. It is undisputed that the officer instructed Marcavage several times to turn off the camera, and each time he refused. Id. at 55:19-20; Phila. MSJ, Ex. B at 110:18-111:1. Officer Michel felt that Marcavage's holding the camera so close to her face posed a threat to her, Penn MSJ Ex. J at 52:4-6 and 24-26, and she sought to grab the camera to get it away from her face. Id. at 55:22-23. Marcavage and the officer agree that Marcavage called 911 on his cell phone (while still holding the camera) -- a conversation that ended when Officer Michel placed him in handcuffs. Id. at 56:1-2 and 21-22; Phila. MSJ, Ex. B at 120. The camera was at some point taken from him and shut off. Id. at 110:18 to 111:1 and 114:1-12. Officer Michel testified that Marcavage had his camera "in [her] face" and was arrested when he refused to move it as she asked. Penn MSJ, Ex. I at 52:4-11 and 54:24 to 58:14.

Marcavage and Fleck were arrested for disorderly conduct and obstruction of a public highway, Penn MSJ SOF ¶50 and Ex. L; see also Compl. ¶43, and were released an hour and a

half later.  Phila. MSJ, Ex. C at 123:13-14.  The video camera was returned to them upon their

release.  Id., Ex. B at 120:9-11.  At some later point, the plaintiffs discovered that their video

footage wasn't kept.  Id., at 119:20 to 121:14.

A third Penn officer, Phoukhong Thammavong, also observed the scene in front of the

mosque.  Id., Ex. K at 21:19, 22:6-8 and 23:24.  He asked Michael Stockwell, one of the

plaintiffs, to move down the street, and walked him down to the corner.  Id. at 23:3-6.  Neither

had any further interaction with the plaintiffs.  Id. at 24:23-25.

In the course of the plaintiffs' activities, the officers made no remarks about the content

of the plaintiffs' speech, displayed no animosity toward these plaintiffs, and made no pro-Islamic

or anti-Christian remarks.  See Ex. E at 22:15-24:18; Phila. MSJ, Ex. C at 89:22-90:6, 93: 12-14

and 102:19-22.

After a proceeding in the Community Court of the Philadelphia Municipal Court on

November 20, 2010, Marcavage and Fleck were found not guilty of disorderly conduct.  The

obstruction charge was earlier withdrawn.  Compl. at ¶¶ 45, 46, 49.

## B.    The Events of August 22, 2010

On August 22, 2010, around 9:00 p.m., Marcavage and Fleck returned to the Walnut

Street mosque with two other Repent America adherents, Robert Parker and Patrick Colaciccio.

Phila. MSJ SOF ¶5.  The four plaintiffs stood in a line facing the mosque about ten feet from the

door and began to sing hymns and preach in loud voices.  Phila. MSJ, Ex B at 181:16-17, 183:7-

12 and 184:10-11; Ex. C at 147:3-9.  Marcavage testified that in the course of preaching he

stated that Islam is a destructive religion.  Phila. MSJ, Ex B at 185:11-12.  During this time,

congregants were leaving the mosque.  Id. at 183:3-10.  Ten or fifteen people began to gather on

6

the sidewalk.  Id. at 188:5-7.  Some in the crowd became agitated and at least one person made a

death threat to Marcavage.  Id. at 188: 11-12 and 20-21, 190:5-6.

   Knowing that the police were on their way, Fleck, Parker and Colaciccio headed back to

their car to avoid being arrested.  Phila. MSJ, Ex. C at 149:3-8.  Fleck then returned to try to find

Marcavage.  Id. at 158:10.  Fleck testified that no Philadelphia police officer told him to leave or

prevented him from leaving.  Id. at 152:12-19.  No Philadelphia police officer touched him or

took any personal property from him, nor did any Philadelphia police officer tell him to stop

preaching or threaten him with arrest if he didn't comply.  Phila. MSJ SOF ¶¶ 11-13.

When Lt. Stanford, the sole named Philadelphia police officer, arrived at the mosque, a

congregant told him that the protestors were becoming confrontational with some women there.

Phila. MSJ, Ex. F at 42:3-6.  Stanford stated he saw Marcavage impeding the flow of

congregants into the mosque and preaching loudly and Stanford urged Marcavage to "keep it

down."  Id. at 17:16-18 and 45:12-13.  Marcavage had begun video recording when the officer

arrived and held the camera close to Stanford's face.[5]  At this point, there was no police activity.

Id., Ex. B at 182:9-11 and 193:23-24.

It is undisputed that Lt. Stanford asked Marcavage to shut the camera off while he was

speaking to him, and that Marcavage did not.  Id., Ex. F at 46:13-22; see also Ex. B, 192:4-9 and

193:23-194:11.  The Lieutenant testified that at one point he thought Marcavage was making an

attempt to strike him.  Id. , Ex. F at 47:13.  Lt. Stanford testified that he took Marcavage's

camera and logged it as "property for safekeeping" because of Marcavage's threatening stance

---

[5] Plaintiffs claimed in their complaint that the videos had been deleted, a contention
Marcavage restates in his deposition.  Phila. MSJ, Ex. B at 198:20-23.  But the footage has since
been recovered and was submitted as Exhibit D to the City's motion for summary judgment.

holding the video camera close to the officer's face during their interaction.  Id. at 46:13-22, 47:9-48:7, and 53:10-54:13. With other unnamed officers he briefly detained Marcavage, searched him and told him to leave.  Id., Ex. B at 196:13-197:12.  The Lieutenant completed a property receipt for the camera and returned the camera to Marcavage later that night.  Id. at Ex. E 75-48A and 75-48; see also Ex. B at 200:17-29; see also Ex. F at 50:13-19. [6]

Lt. Stanford did not arrest anyone on August 22, 2010.

### C.    Procedural History

The plaintiffs filed suit on July 3, 2012, seeking redress for First Amendment, Fourth Amendment, Due Process and Equal Protection Clause violations by Penn police officers, Philadelphia police officers and AlliedBarton security employees, as well as for false arrest, false imprisonment, and malicious prosecution under state law.  See Compl.  AlliedBarton and Penn filed motions to dismiss.  In our February 20, 2013 Order we dismissed all claims against AlliedBarton because we held as a matter of law it is not a state actor nor were its employees. Likewise, we dismissed the plaintiffs' supervisory liability claims against Penn for a similar lack of proof.  We also dismissed plaintiffs' supervisory liability claims against twenty-five unnamed John Doe defendants at Penn and AlliedBarton and dismissed the Equal Protection claims in their entirety.  Finally, we dismissed official capacity claims against the individual Penn police officers.

Pursuant to our August 8, 2013 Order, Penn and the City filed motions for summary

---

[6] Although the City offers as an exhibit an internal police directive permitting individuals to publicly video police activities, see Phila. MSJ, Ex. G, this policy statement can have no direct bearing on the matter before us as it is dated September 11, 2012 -- more than two years after the events at issue.

judgment on September 20, 2013.  Plaintiffs' reply was due on October 11, 2013, but none was filed.[7]

We have federal question jurisdiction over the plaintiffs' civil rights claims pursuant to 42 U.S.C. §1983 and supplemental jurisdictiohn over their state law claims under 28 U.S.C. §1337.

## II.    **Standard of Review**

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party moving for summary judgment bears the burden of proving no genuine issue of material fact exists.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).  To that end, the movant must inform the district court of the basis for its argument by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Where the movant is the defendant or the party that does not have the burden of proof on the underlying claim, it "has no obligation to produce evidence negating its opponent's case," National State Bank v. Federal Reserve Bank of New York , 979 F.2d 1579, 1582 (3d Cir. 1992).  The movant need only point to the lack of evidence supporting the non-movant's claim.  Id.

Rule 56 requires the nonmoving party "to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate

---

[7] Oddly, plaintiffs had counsel from the filing of the complaint to the completion of discovery.

'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324; <u>see also</u> Fed. R. Civ. P. 56(c).  A factual dispute is "genuine" is it turns on "evidence on which the jury could reasonably find for the plaintiff." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." <u>Id.</u> at 248.

If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to judgment as a matter of law. <u>See</u> <u>Celotex</u>, 477 U.S. at 322.  Specifically, Rule 56(e) provides in relevant part that "[i]f a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials--including the facts considered undisputed-- show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

Our inquiry here must be more searching because both defendants' motions are unopposed.  Summary judgment cannot be granted by default even if there is a complete failure to respond to the motion. <u>See</u> Advisory Committee Notes, 2010 Amendments.  For that reason, it is not enough for facts to be undisputed; the court "must determine the legal consequences of these facts and permissible inferences from them." <u>Id.</u>  As our Court of Appeals held in <u>Stackhouse v. Mazurkiewicz</u>, 951 F.2d 29 (3d Cir. 1991), we must not grant summary judgment without considering the merits of defendants' unopposed motion. <u>Id.</u> at 30; <u>see</u> <u>also</u> <u>Lorenzo v. Griffith</u>, 12 F.3d 23, 28 (3d Cir. 1993).  In doing so, we "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000), cited in <u>Amour v. County of Beaver, PA</u>, 271 F.3d 417, 420 (3d Cir. 2001).

III.   **Discussion**

    A.   **Claims Against Penn**

        1.   **Threshold Issue: Whether Penn's Police Department Is A State Actor**

Section 1983 provides in relevant part that

> Every person who, under color of any statute. . . of any State . . .
> subjects, or causes to be subjected, any citizen of the United States
> . . . to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured[.]

42 U.S.C. §1983.  This statute "is not a source of substantive rights but a vehicle for vindicating rights conferred by the U.S. Constitution or by federal statute."  DiBella v. Borough of Beachwood, 407 F.3d 588, 601 (3d Cir. 2005).  To establish liability under Section 1983, the plaintiffs must show that the deprivations they allege occurred while the Penn defendants were acting under color of state law.

    In its motion to dismiss, Penn stated that it is "a private institution whose actions are not fairly attributable to the state," and that "[a]lthough this point is not raised in the present [m]otion, Penn does not waive it, nor does it concede that it is subject to liability under 42 U.S.C. §1983."  Penn MTD at 1 n.1.  But Penn did not raise this defense in its motion for summary judgment, but rather asserted, inter alia, a qualified-immunity defense on behalf of its police officers.  See Brosseau v. Haugen, 543 U.S. 194, 198 (2004) ("Qualified immunity shields [a government] officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.").

    Whether one is subject to suit under §1983 rests on a determination that the alleged infringement of federal rights is "fairly attributable to the State."  Lugar v. Edmonson  Oil Co.,

457 U.S. 922, 937 (1982).   As the Supreme Court had by then explained,

> By the plain terms of §1983, two -- and only two -- allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law.

Gomez v. Toledo, 446 U.S. 635, 640 (1980).  Ordinarily, a plaintiff asserting a §1983 claim

bears the burden of showing that the challenged conduct may be fairly construed as state action,

West v. Atkins, 487 U.S. 42, 48 (1988).  But because Penn's motion is unopposed, that task falls

to us as part of the merits analysis we undertake to determine whether Penn is entitled to

judgment as a matter of law.   Anchorage Associates v. Virgin Islands Board of Tax Review, 922

F.2d 168, 175 (3d Cir. 1990).  If the Penn police were not state actors, the constitutional claims

against them and the University would be dismissed because the acting under color of state law

element is a threshold issue in a §1983 claim.  Versarge v. Township of Clinton, N.J., 984 F.2d

1359, 1363 (3d Cir. 1993).  We conclude, however, that in this matter the Penn police officers

were acting as state actors and thus Penn is properly subject to liability under plaintiffs' §1983

claims.

        The state action inquiry is a fact-intensive one for which the Supreme Court has over the

years supplied varied tests.  Those tests have evolved from the symbiotic relationship test,

Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961) -- where the state and private

party mutually benefit each other -- to the close nexus test, Jackson v. Metro. Edison Co., 419

U.S. 345 (1974) -- which seeks to determine whether the state has exercised coercive power -- to

the joint participation test in Lugar -- where a creditor used state power to attach property under

a state prejudgment attachment statute -- to the pervasive entwinement theory articulated in

<u>Brentwood Academy v. Tennessee Secondary School Athletic Ass'n</u>, 531 U.S. 288 (2001) -- an undefined standard that looks to the depth of involvement by the state in a private entity. Finally, the "public function test" finds state action when a private entity carries out a function that had historically been the "exclusive prerogative" of the state, <u>Flagg Bros. v. Brooks</u>, 436 U.S. 149, 157-158 (1978).

> But any approach a court uses must remain focused on the heart of the state action inquiry, which . . . is to discern if the defendant exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.

<u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 639 n.17 (3d Cir. 1995) (internal citations and quotation marks omitted).

Our Court of Appeals has considered the status of Commonwealth universities primarily in the context of "state-related" institutions.  In <u>Henderson v. Fisher</u>, 631 F.2d 1115 (3d Cir. 1980), the Court held that the University of Pittsburgh's campus police were state actors.  That holding rested primarily on the Court's interpretation of the University of Pittsburgh-Commonwealth Act, under which it found that the school "ha[d] lost its wholly private character, and has become 'an instrumentality of the Commonwealth to serve as a State related institution.'" <u>Id.</u> at 1118 (citing Pa.Cons.Stat.Ann. tit. 24, §2510-202(6)).

> Although this is itself persuasive of the presence of state action, we further note that the Pennsylvania legislature has delegated to the campus police of the University of Pittsburgh the very powers which the municipal police force of Pittsburgh possesses.

<u>Id.</u>  Similarly, in <u>Krynicky v. University of Pittsburgh</u>, 742 F.2d 94 (3d Cir. 1984), our Court of Appeals held that both Temple University and the University of Pittsburgh were state-related institutions, "intertwined" with the Commonwealth through a statutory relationship that sets

annual appropriations, financial aid, tuition, trustee appointments and also subjects the institutions to audits and reporting requirements.  Id. at 102.

No such statutory scheme links Penn to the Commonwealth.  For that reason, where other plaintiffs have asserted discrimination claims against Penn, courts in this District have found as a matter of law that Penn is not a state actor.  In Pik v. University of Pennsylvania, et al., 2010 WL 3933275 (E.D.Pa. Oct. 7, 2010), Judge McLaughlin held that Penn was a "state-aided" institution receiving "substantial funds from the Commonwealth" but "not subject to pervasive regulation" and therefore not a state actor when the plaintiff claimed Penn had provided false and damaging references to a subsequent employer, which he characterized as a violation of his constitutional right to a liberty interest in his reputation.  Id. at *1, *6 and *7.  Likewise, Judge O'Neill concluded that Penn was not a state actor when a plaintiff claimed disparate treatment based on national origin.  Karakozova v. Trustees of University of Pennsylvania, 2011 WL 1754468 (E.D.Pa. May 9, 2011).

But here Penn's state-actor status rests not on its source of funds but on the police service performed, an inquiry better suited to the "exclusive prerogative" test articulated in Flagg Bros. The Supreme Court has left open the circumstances under which private security officers may be deemed to perform public functions for purposes of §1983 suits.   While our Court of Appeals has not refined its Henderson holding, other federal courts have found state action where a security guard is employed by a police department, Travers v. Meshriy, 627 F.2d 934 (9th Cir. 1980), or works jointly with a township police officer, Padover v. Gimbel Bros., Inc., 412 F. Supp. 920 (E.D.Pa. 1976) (Ditter, J.).  On the other hand, a security guard was held not to be a state actor where no state or municipal police power was involved, see Wade v. Byles, 83 F.3d 902 (7th Cir. 1996), or when a college security guard, despite also being a local police officer,

14

acts solely in his college-guard capacity, see Robinson v. Davis, 447 F.2d 753 (4th Cir. 1971).

To be sure, "[w]here private security guards are endowed by law with plenary police powers such that they are de facto police officers, they may qualify as state actors under the public function test," Romanski v. Detroit Entertainment, L.L.C., 428 F.3d 629, 637 (6th Cir. 2005) (citing Henderson).

Penn's Police Department describes itself as

> [T]he largest private police department in the Commonwealth of Pennsylvania, . . . maintain[ing] the second largest number of full-time sworn police officers amongst all private Universities across the United States, and the third largest number of sworn police officers for all Universities nationwide, both public and private. All personnel of the UPPD are full-time sworn municipal police officers certified through the Commonwealth of Pennsylvania Municipal Police Officers Training and Education Commission, and retain general law enforcement authority and order maintenance for the area in which the University of Pennsylvania is situated.

See http://www.publicsafety.upenn.edu/UPPD/.[8]  The Penn Police Department's so-called patrol zone extends well beyond the borders of the University campus to encompass a large slice of West Philadelphia -- roughly between Market Street and Baltimore Avenue, from 43rd Street to the Schuylkill River -- an area that includes the Masjid Al Jamia Mosque at 4228 Walnut Street. Id.  Penn police officers are "highly-trained in a number of specialized areas including: emergency response, crisis and hostage negotiation, dignitary protection, traffic safety, motorcycle and bicycle patrol." Id.   The Department maintains a fifteen-person Detective Unit that conducts criminal investigations and crime scene analysis.  Id.  The Penn Police Department has been accredited through the Commission on the Accreditation of Law Enforcement Agencies

---

[8] Last visited Feb. 4, 2014.

15

-- a standard-setting body, since March of 2001.  Its officers have worked with a Drug

Enforcement Administration task force, United States v. Ford, 618 F.Supp.2d 368 (E.D.Pa. 2009)

(Pollak, J.), and with FBI investigators on credit-card identity theft, United States v. Barr, 454

F.Supp.2d 229 (E.D.Pa. 2006) (Rufe, J.).

Here, Officers Cooper, Michel and Thammavong were on patrol on a street within the

Penn Police Department's patrol zone, and when their efforts to maintain public order failed,

they arrested two instigators of the disturbance.  Accordingly, we find that Pennsylvania law

endows the Penn Police Department with the plenary authority of a municipal police department

in the patrol-zone territory, once the "exclusive prerogative" of the City of Philadelphia.

But the Penn Police Department is not an entity capable of being sued.  Rather, the

University itself, i.e., the Trustees of the University of Pennsylvania, is the proper defendant for

purposes of a §1983 suit (along with the named individual officers).  See Gaines v. University of

Pennsylvania Police Dept., 1997 WL 624281 at *3 (E.D.Pa. Oct. 7, 1997) (Newcomer, J.)

(finding that "Penn's relationship to the Penn Police should be considered analogous to a

municipality's relationship with its police department").  Penn's police officers therefore are state

actors for Section 1983 purposes.


### 2.       Plaintiffs' First Amendment Claim Against Individual Penn Officers

Plaintiffs claim the individual Penn officers violated their First Amendment right to

preach.  Only the personal-capacity claims remain after we dismissed a number of plaintiffs'

claims in February of 2013.  We now hold that Penn officers Cooper, Michel and Thammavong

did not violate plaintiffs' First Amendment rights.[9]

The First Amendment does not promise citizens an unfettered speech right even on public byways. "[W]e have repeatedly referred to public streets as the archetype of a traditional public forum, [because since] time out of mind, public streets and sidewalks have been used for public assembly and debate." Frisby v. Schultz, 487 U.S. 474, 480 (1988) (internal citations and quotations omitted). Nonetheless, "even protected speech is not equally permissible in all places and at all times." Id. at 479 (citing Cornelius v. NAACP Legal Defense & Educational Fund, Inc., 473 U.S. 788, 799 (1985).

States may not prohibit all communication in a traditional public forum, but it may "enforce regulations of the time, place and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Id. at 481 (citing Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 45 (1983); see also Northeast Women's Center, Inc. v. McMonagle, 939 F.2d 57 (3d Cir. 1991).

Any inquiry into speech regulation must first determine "whether the government has adopted a regulation of speech because of disagreement with the message it conveys", or whether the regulation is content neutral. Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). What matters is the government's purpose or intent. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it may have an incidental effect on some speakers or messages but not others. Id. As our court of Appeals has put it,

A regulation is deemed content neutral if it serves purposes

_____

[9] The First Amendment provides, in relevant part, "Congress shall make no law . . . abridging the freedom of speech." This limit on Congress's power applies to the states through the Fourteenth Amendment. Cantwell v. State of Connecticut, 310 U.S. 296 (1940).

> unrelated to the content of speech, regardless of whether it
> incidentally affects certain speakers or messages and not others.
> That is, government regulation of speech is properly regarded as
> content neutral if it is justified without reference to the content of
> the regulated speech.

Startzell v. City of Philadelphia, Pennsylvania, 533 F.3d 183, 197 (3d Cir. 2008) (internal

citation, emphasis and quotations omitted).

Here, no Penn officer made any reference to the content of plaintiffs' speech--nor did

plaintiffs identify any Penn officer's statement as suggesting their actions were spurred by

disagreement with their message. Indeed, nothing in this record suggests the officers sought to

restrict the preaching because of the discomfort it caused others, a content-based motivation our

Court of Appeals condemns. See United States v. Marcavage, 609 F.3d 264 (3d Cir. 2010).

Officers Cooper and Michel both told the plaintiffs they could not impede the mosque entry but

could continue preaching at a modest distance from the front of the mosque. The justification of

maintaining public order and crowd control, protecting all parties and diffusing a potentially

explosive situation "satisfies the requirement that time, place or manner regulations be content

neutral," Ward, 491 U.S. at 792.

As to the second public forum prong, a statute is narrowly tailored if it eliminates no

more than the exact source of the evil it seeks to remedy. See City Council of Los Angeles v.

Taxpayers for Vincent, 466 U.S. 789, 808-810 (1984). But such a speech regulation "need not

be the least restrictive or least intrusive means. . . so long as the regulation promotes a substantial

government interest that would be achieved less effectively absent the regulation." Ward, 491

U.S. at 798-99. The Supreme Court, upholding the picketing ban in Frisby, found that the

picketers did not "seek to disseminate a message to the general public, but to intrude. . . in an

especially offensive way." Frisby, 489 U.S. at 486. However offensive the plaintiffs' intrusions

18

here were -- from their condemnation of Islam to the volume of their exhortations to their physical intrusion at the mosque's entrance -- the Penn officers never in any way prevented them from speaking.  Rather, the officers only sought -- repeatedly and unsuccessfully -- to edge the plaintiffs up the street in order to defuse the tense and potentially incendiary situation.

Finally, the Supreme Court sustained a local ordinance banning picketing in front of any residence because the ban preserved ample alternative channels of communication -- including walking through the residential area, distributing literature door-to-door or through the mails, and contacting residents by telephone ("short of harassment").  Id. at 484.  Similarly, our Court of Appeals found no First Amendment violation when Philadelphia police told disruptive protestors to cease blocking access to a public event because they had "alternative ways to express themselves without causing disruption." Startzell, 533 F.3d at 202.  Here, the Penn officers encouraged plaintiffs to move out of the mosque's doorway and continue their speech activity down the street, a move which would not have limited plaintiffs' communication with the growing crowd.  That the plaintiffs chose not to move does not convert the officers' encouragement into a First Amendment violation.

For these reasons, the Penn officers did not violate plaintiffs' First Amendment speech rights when they sought to move them a few feet away from the front of the Walnut Street mosque on July 3, 2010.[10]

---

[10] We see no need to address plaintiffs' allegation that the Penn officers' acts "chilled" their speech, a contention belied by their return to preach in front of the same mosque seven weeks later.  Compl. at 13014; see also Phila. MSJ, Ex. C at 163:8-11, where Fleck describes open-air preaching after the West Philadelphia incidents.  When a party shows no change in behavior, he can show no chilling of his First Amendment right to free speech. See Singer v. Fulton County Sheriff, 63 F.3d 110 (2d Cir. 1995).

###### 3.      Plaintiffs' Fourth Amendment Claim Against Individual Penn Officers

Plaintiffs Marcavage and Fleck allege that they were arrested without probable cause in violation of the Fourth Amendment.[11]  They also claim a Fourth Amendment violation when Marcavage's video camera and recording were seized.  The Penn defendants assert that the individual officers are entitled to qualified immunity because they had probable cause for arresting the plaintiffs as a result of their conduct.

We analyze the plaintiffs' claim under both the First and Fourth Amendments because their claim partakes of both, as further detailed below.

The doctrine of qualified immunity protects governmental officials when they are sued in their personal capacity "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Gilles v. Davis, 427 F.3d 197, 203 (3d Cir. 2005) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Such entitlement is an immunity from suit rather than a mere defense to liability.  Mitchell v. Forsyth, 474 U.S. 511, 526 (1985) (emphasis in original).  As the Supreme Court noted in Pearson v. Callahan, 555 U.S. 223 (2009), "[q]ualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Id. at 231.

Because of that balance, the qualified immunity standard "gives ample room for mistaken

---

[11] The Fourth Amendment provides in pertinent part that "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause. . . ."

judgments by protecting all but the plainly incompetent or those who knowingly violate the law."
Hunter v. Bryant, 502 U.S. 224, 229 (1991) (internal quotations omitted); see also Gilles, 427
F.3d at 203.  The protection of qualified immunity applies regardless of whether the official's
error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and
fact." Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J. dissenting) (quoting Butz v.
Economou, 438 U.S. 478, 507 (1978)).

The Supreme Court directs that courts resolving an official's qualified-immunity claim
must make a two-prong inquiry:  Do the facts alleged, viewed in the light most favorable to the
party asserting injury, make out a constitutional violation and was that right clearly established?
See Saucier v. Katz, 533 U.S. 194 (2001); see also Curley v. Klem, 298 F.3d 271, 277 (3d Cir.
2002).   As the Court later explained in Pearson, this two-step inquiry is not a rigid sequence.
Rather, a negative finding on either prong entitles the official to qualified immunity.   See also
George v. Rehiel, 738 F.3d 562, 572 (3d. Cir. 2013).

Probable cause to arrest exists when the information known to the officer at the time of
the arrest would be enough to allow a reasonable law enforcement officer to believe that the
arrestee has been, or is committing, an offense.  Whiting v. Bonazza, 2013 WL 5630622 (3d Cir.
Oct. 16, 2013).  Here, the plaintiffs were arrested for disorderly conduct under 18
Pa.Cons.Stat.Ann. §5503(a) (obstructing a public highway, a charge dropped before they
appeared in court).  Under that statute, one is guilty of disorderly conduct if,

> with intent to cause public inconvenience, annoyance or alarm, or
> recklessly creating a risk thereof, he:
> (1)   engages in fighting or threatening, or in violent or tumultuous
>        behavior;
> (2)   makes unreasonable noise;
> (3)   uses obscene language, or makes an obscene gesture; or
> (4)   creates a hazardous or physically offensive condition by any

act which serves no legitimate purpose of the actor.

Id.

Under Pennsylvania law, whether words give rise to a disorderly conduct charge "hinges upon whether they cause or unjustifiably risk a public disturbance." Commonwealth v. Hock, 728 A.2d 943, 946 (Pa. 1999). As our Court of Appeals held in Startzell, 533 F.3d at 204, "the First Amendment is not an absolute shield against a disorderly conduct charge."

The First Amendment does not shield plaintiffs here. Both officers (and the AlliedBarton employee) observed the plaintiffs making unreasonable noise -- so much so that the officers had to raise their own voices to be heard. The plaintiffs' position in the mosque doorway served no legitimate purpose, but only risked creating public inconvenience and alarm. The reaction their presence elicited was without doubt provocative and potentially tumultuous. Such circumstances gave rise to ample probable cause for a disorderly conduct arrest.

That Marcavage and Fleck were acquitted of the disorderly conduct charge does not undermine the arresting officers' claim of qualified immunity because the qualified protection encompasses "all but the plainly incompetent" or knowingly mistaken judgments. Hunter, 502 U.S. at 229. The reasonableness of the officers' judgment at the time cannot be second-guessed in hindsight but must only be judged under the split-second, tense and uncertain conditions they encountered on the scene. See Saucier, 533 U.S. at 204-205.

Thus, the Penn individual officers are entitled to qualified immunity for the arrest.

Plaintiffs also claim that this arrest "chilled" from the exercise of their free-speech rights. Irrefutable proof to the contrary exists in the subsequent events recounted in Marcavage v. City of Syracuse, 2013 WL 3788569 (N.D.N.Y. June 6, 2013), and Marcavage v. City of New York, 918 F.Supp. 2d 266 (S.D.N.Y. Jan. 23, 2013). When a party shows no change in behavior, he

22

can show no chilling of his First Amendment right to free speech. <u>See</u> <u>Singer v. Fulton County</u> <u>Sheriff</u>, 63 F.3d 110 (2d Cir. 1995). We need give this claim no further consideration and will dismiss it.

We now consider the seizure of Marcavage's video recorder and the erasure of the recording. Plaintiffs characterize that action as a Fourth Amendment violation, but most courts that have considered claims arising from the filming or video recording of police activity -- including our Court of Appeals -- analyze the issue under the First Amendment, and we do so here. "We have long recognized that the seizure of films or books on the basis of their content implicates First Amendment concerns not raised by other kinds of seizures." <u>New York v. P.J.</u> <u>Video, Inc.</u>, 475 U.S. 868, 873 (1986).

Because qualified immunity is an affirmative defense, Penn bears the initial burden. <u>Hicks v. Feeney</u>, 850 F.2d 152, 159 (3d Cir. 1988). The burden then shifts to the plaintiffs to show that the official violated a right so clearly established "that every reasonable official would have understood that what he is doing violates that right." <u>Ashcroft v. al-Kidd</u>, 131 S.Ct. 2074, 2083 (2011) (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)). Here, where the plaintiffs have elected not to oppose summary judgment, we must still examine whether the seizure and erasure of the videotape violated a clearly established First Amendment right.

The contours of clearly established rights in the context of qualified immunity are not always sharply drawn. As our Court of Appeals has held, "[i]n determining whether a right is clearly established, it is not necessary that the exact set of factual circumstances [have] been considered previously." <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 259 (3d Cir. 2010) (citing

23

Hope v. Pelzer, 536 U.S. 730, 739 (2002).[12]

     In Kelly, a police officer pulled a car over for a routine traffic stop and the plaintiff, a passenger, recorded the stop with a small handheld video camera he had in his lap.  Id. at 251.  After checking with an assistant district attorney about the legality of arresting the passenger for violation of a state wiretap law, the officer arrested Kelly.  Id. at 252.  Kelly sued under Section 1983 for violations of his First and Fourth Amendment rights.  Our Court of Appeals reviewed decisions within this Circuit and from other circuits and determined that the right to videotape police during a traffic stop was not clearly established.   Hinging its conclusion on the inherent dangers of traffic stops, our Court of Appeals held that

> there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment.

Id.

     The Court also stated that "even insofar as it is clearly established, the right to record matters of public concern is not absolute; it is subject to reasonable time, place, and manner restrictions."  Id. (emphasis in original).  In a subsequent non-precedential decision, our Court of

---

[12] The Second Circuit adopted a more formal approach in Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989) (citing Anderson, 483 U.S. 635 (1987)):

> Several guidelines have emerged from case law to clarify a court's inquiry into when a right is clearly established.  First, the particular right under consideration must be defined with reasonable specificity. Next, the court must determine whether the decisional law of the Supreme Court or the appropriate circuit court has clearly established the right in question. The ultimate inquiry is whether in light of preexisting law the unlawfulness of the defendant official's actions is apparent.

Appeals held that "our case law does not clearly establish a right to videotape police officers performing their official duties." <u>True Blue Auctions v. Foster</u>, 528 Fed.Appx. 190, 193 (3d Cir. 2013).[13]

The circumstances here differ. The plaintiffs were on a public street, not in a car, and initially recorded only their own activity. But when they ignored repeated police requests to move from the mosque doorway and lower their voices, the landscape changed. Marcavage refused to shift the camera away from the Penn officer's face, a refusal she took as a threat. That disregard led to their arrest and the video camera's seizure. Under such circumstances we hold

---

[13] To be sure, these decisions place our Court of Appeals in the minority among those circuits that have considered the free speech right to openly record police activity. The Eleventh Circuit held there is a "First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct" because the First Amendment protects the right to record matters of public interest, <u>Smith v. City of Cumming</u>, 212 F.3d 1332,1333 (11th Cir. 2000).  Since <u>Kelly</u>, the First Circuit held that the right to film government officials was clearly established in that circuit, <u>Gilk v. Cunniffe</u>, 655 F.3d 78 (1st Cir. 2011), as has the Seventh Circuit, <u>Am. Civil Liberties Union of Illinois v. Alvarez</u>, 679 F.3d 583 (7th Cir. 2012). The Ninth Circuit recently held there is a clearly established constitutional right to photograph the scene of an accident during a police investigation, <u>Adkins v. Limtiaco</u>, 537 Fed.Appx. 721, 722 (9th Cir. 2013) (citing <u>City of Houston v. Hill</u>, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.")).

More recently, the Department of Justice ("DOJ") urged the District of Maryland to recognize that "[t]he right to record police officers while performing duties in a public place, as well as the right to be protected from the warrantless seizure and destruction of those recordings, are not only required by the Constitution.  They are consistent with our fundamental notions of liberty, promote the accountability of our governmental officers, and instill public confidence in the police officers who serve us daily." <u>Sharp v. Baltimore City Police et al.</u>, CA 11-2888, (D. MD, Jan. 10, 2012), DOJ Statement of Interest.

In light of these recent decisions, the Philadelphia Police Department issued 2012 guidelines "to protect the constitutional rights of individuals to record police officers engaged in the public discharge of their duties," Phila. MSJ, Ex. G.  While this suggests that the determination of a clearly established right to record police activity may be ripe for reconsideration in our Circuit, those later guidelines most assuredly do not alter the legal landscape that existed in the summer of 2010.

that there was then no clearly-established First Amendment right in our Circuit to film police activity where, as here, the plaintiffs actively impeded efforts to restore public order.[14]

### 4.        Due Process Claim Against Individual Penn Officers

Plaintiffs allege that the Penn officers deprived them of their property without due process when the camera was seized and the video destroyed.  The Penn defendants do not address this claim.  We may, however, consider summary judgment after identifying material facts that are not genuinely in dispute.  See Fed. R. Civ. P. 56(f)(3).

We consider the camera seizure first.  To determine whether a constitutional violation has occurred, we must ask what process the State provided, and whether it was constitutionally adequate.  See Zinermon v. Burch, 494 U.S. 113, 126 (1990).  Even an unauthorized intentional deprivation of property does not constitute a violation of due process if a meaningful post-deprivation remedy for the loss is available.  Hudson v. Palmer, 468 U.S. 517, 531-36 (1984); see also Hicks v. Feeney, 770 F.2d 375, 378 (3d Cir. 1985)("if the deprivation is the result of the random and unauthorized conduct of a state employee, i.e. a misuse of official power, . . . the inquiry then focuses on the adequacy of state post-deprivation remedies").  Here, the remedy was adequate as the camera was returned to plaintiffs immediately upon their release from detention. We find that plaintiffs are entitled to no further relief.

The erasure of the video poses a different problem.  Even if plaintiffs had no clearly

---

[14] We distinguish the present case from Robinson v. Fetterman, 378 F.Supp.2d 534 (E.D.Pa. 2005), where Judge Bartle found a free-speech right to film police officers in the performance of their public duties where a citizen stood on private land to do so and never interfered with the police activity he observed.

established right to record the police outside the mosque, the recording was their property.  And

when the camera was returned, that video had been erased. Plaintiffs had neither notice nor an

opportunity to object to the video's erasure, nor is any meaningful or adequate post-derivation

process possible.

But as the Supreme Court held in Daniels v. Williams, 474 U.S. 327 (1986), not all

deprivations are created equal: "[a]n intentional violation of a right protected by the Due Process

Clause is within the reach of §1983 [but] mere negligence is insufficient to make out a claim."

Fagan v. City of Vineland, 22 F.3d 1296, 1310 (3d Cir. 1994).  The burden is on the nonmovant

to search the record and detail the material controverting the movant's position.  See Schulz v.

Celotex Corp., 942 F.2d 204, 210 (3d Cir.1991).  The record here cannot show an intentional

deprivation.  Marcavage testified that Officer Michel "grabbed the camera and physically shut it

off."  Phila. MSJ, Ex. B at 110:22; see also id. at 114:11-12.  But, tellingly, he does not allege

that she intended to erase the recording.  The officer's action, as plaintiff describes it, is

insufficient to maintain an allegation of intentional deprivation.  Because we find that the

officer's act was at worst negligent, we conclude that the Due Process Clause is not implicated.

We will grant summary judgment on all of plaintiffs' due process claims, including the

camera seizure and the video erasure.  As our Court of Appeals recognized in Gibson v. Mayor

and Council of the City of Wilmington, 355 F.3d 215 (3d Cir. 2004), sua sponte summary

judgment is appropriate in "the presence of a fully developed record, the lack of prejudice, or a

decision based on a purely legal issue."  Id. at 224; see also Celotex, 477 U.S. at 326 ("[D]istrict

courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so

long as the losing party was on notice that she had to come forward with all of her evidence.");

accord Acumed LLC v. Advanced Surgical Services, Inc., 561 F.3d 199, 224 (3d Cir. 2009).

5.      **The State Law Claims against Penn**

Plaintiffs Fleck and Marcavage challenge the actions of Penn officers in arresting them and make claims for false arrest, false imprisonment and malicious prosecution under Pennsylvania law.  Defendants contend these claims fail as a matter of law. We agree.

"The central issue in determining liability in a Section 1983 action based on a claim of false arrest is 'whether the arresting officers had probable cause to believe the person arrested had committed the offense.' "  Wagner v. Waitlevertch, 774 A.2d 1247, 1253 (Pa.Super. 2001) (quoting Dowling v. Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988)).  As stated above, the Penn officers had ample probable cause to arrest the plaintiffs for disorderly conduct, and so plaintiffs cannot prevail on their claim of false arrest.

The elements of false imprisonment are largely the same as for false arrest: the detention of another that is unlawful.  Manley v. Fitzgerald, 997 A.2d 1235, 1241 (Pa. Cmwlth. 2010).  Because "[a]n arrest based on probable cause would be justified, regardless of whether the individual arrested was guilty or not," Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994), this claim fails as well.

Finally, we consider plaintiffs' malicious prosecution claim.  To prevail, plaintiffs must show that the court proceedings were instituted without probable cause and with malice and that they terminated in their favor.  Turano v. Hunt, 631 A.2d 822, 824 (Pa. Cmwlth. 1993). "Absence of probable cause is an indispensable element of the action and it is not conclusively established by an adjudication of innocence in the prior proceeding." Id. at 824.  Because the officers without doubt had probable cause to arrest plaintiffs, this claim, too, fails as a matter of law.

We will also dismiss all claims against the named defendant Officer Thammavong,

against whom plaintiffs made no specific factual allegations.  We will grant summary judgment to Penn and the individual officers on plaintiffs' state claims.

## C.    Claims Against The City of Philadelphia

Plaintiffs assert First Amendment, Fourth Amendment and Due Process Clause claims against the City of Philadelphia and Philadelphia Police Lt. Stanford arising from the August 22, 2010 events.  They seek compensatory and punitive damages and to enjoin defendants from suppressing religious speech in public forums.

"The difference between suits filed against municipal officials in their governmental and personal capacities has tended at times to become muddled.  [We must] point[] out the salient characteristics that separate the two kinds of cases."  Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988).   By seeking punitive damages, plaintiffs assert their claims against Lt. Stanford in his personal capacity.[15]  But to prevail on a claim against the City for injunctive and compensatory relief, plaintiffs must establish that the municipality itself caused the alleged underlying constitutional violation through the implementation of a municipal custom, policy or practice.  Monell, 436 U.S. at 694.

We will consider the underlying constitutional claims against the named officer first, and the claim against the City separately.

### 1.    First Amendment Claims

On August 22, 2010, Marcavage and the Repent America adherents stood about ten feet from the Walnut Street mosque to sing and preach -- not in the mosque doorway.  That

---

[15] Punitive damages are not available against a municipality, only against an official personally.  See Kentucky v. Graham, 473 U.S. 159, 167 n.13 (1985).

difference with the earlier event affects our analysis of plaintiffs' claims but not our conclusion.

Our Court of Appeals has held that

> [a] state or municipality has the right to regulate the use of city streets "to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly."

Startzell, 533 F.3d at 197 (citing Cox v. Louisiana, 379 U.S. 536, 554 (1965)).  But that right to free speech does not encompass the right to cause disruption.  Id. at 198.  It is undisputed that the Marcavage group engaged in the same activities as before -- singing hymns and preaching loudly, and again a crowd gathered and police officers arrived.  It is likewise undisputed that the confrontation between the mosque congregants and the Marcavage group became tense -- to the point where Lt. Stanford himself felt threatened.  Under such circumstances, the police may act to safeguard the interests of both sides if they do so based on conduct, not content.  Id.; see also Kroll v. U.S. Capitol Police, 847 F.2d 899 (D.C. Cir. 1988).

Lt. Stanford made no impermissible reference to the content of plaintiffs' preaching, nor have plaintiffs alleged otherwise.  Rather, he sought to diffuse a potential confrontation by reasonably urging the plaintiffs to modulate the volume of their voices.  In no way did he seek to restrict their preaching.  In short, Lt. Stanford did not violate plaintiffs' First Amendment rights. We will therefore grant summary judgment to the City defendants for the First Amendment personal capacity claim against Lt. Stanford.

## 2. **Fourth Amendment Claims**

Plaintiffs' Fourth Amendment claim relates solely to Marcavage, because no other Repent America member was detained and none was arrested in the Philadelphia police incident. Marcavage alleges a Fourth Amendment violation because Lt. Stanford and other unnamed

officers stopped him, searched him and took his video camera.  He was not arrested.  The City

asserts that the momentary detention was permissible under a "totality of the circumstances" test,

taking into account not only the growing hostile crowd that justified police intervention but also

Marcavage's aggressive conduct toward the officer with the video camera.

As explained above, we will analyze the detention and seizure under separate inquiries.

Any investigatory detention, however brief, is a seizure within the meaning of the Fourth

Amendment, see United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006).  An officer

may make a brief investigatory stop if he has "a reasonable, articulable suspicion that criminal

activity is afoot."  United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000).  That standard,

less demanding than probable cause, requires a minimal level of objective justification.  Delfin-

Colina, 464 F.3d at 396.  Ultimately, we must consider the whole picture.  See United States v.

Sokolow, 490 U.S. 1, 8 (1989).

The whole picture is by now clear.  When Lt. Stanford arrived, he saw a hostile crowd.

He saw the Marcavage group confronting congregants.  He heard loud preaching.  He saw

Marcavage impeding flow in and out of the mosque.  And he experienced Marcavage

aggressively wielding a handheld camera toward him while filming, an act Marcavage refused to

cease despite a direct police order to do so.  These constitute "specific, articulable facts. . . [to]

support reasonable suspicion of [an] infraction," Delfin-Colina, 464 F.3d at 400.  These acts

justified Lt. Stanford and other unnamed officers in stopping Marcavage and searching him for

identification after taking the camera from him.  Accordingly, we find no Fourth Amendment

violation when Lt. Stanford stopped him.

As to the seizure of the camera, we will incorporate our analysis above.  Here, there was

no First Amendment violation when the Philadelphia police officer took Marcavage's camera

31

from him because he did not at the time have a clearly established right to record police activity instigated by his own confrontational acts.  As previously noted, although the plaintiffs complained that their video was destroyed, it was not, and has been submitted as the City's Exhibit D.

Accordingly, the City defendants are entitled to summary judgment for the Fourth Amendment personal capacity claims against Lt. Stanford.

### 3.   Due Process Clause Claim

Plaintiffs also claim that the confiscation of the video camera, which Lt. Stanford took from Marcavage and returned to him later that night, constitutes an unlawful deprivation without due process.  The City defendants argue that (1) the possession of a video camera is not a fundamental property right and (2) the return of the camera was an adequate post-deprivation remedy.

We agree with the second point and find no deprivation.   As we explained above, under the cognate circumstances of plaintiffs' confrontation with the City officers, the return of the camera later that night provided Marcavage with an adequate post-deprivation remedy.  See Hicks, 770 F.2d at 378.  We will therefore grant summary judgment for the City defendants.

### 4.   State Law Claims

Plaintiffs assert state law claims of false arrest, false imprisonment and malicious prosecution against the City and Lt. Stanford.  The defendants assert that the Political Subdivision Tort Claims Act, 42 Pa.Cons. Stat.Ann. §§8541-8564, provides that an employee may be liable for tortious conduct only where there is willful misconduct or under one of the

exceptions enumerated in the Tort Claims Act.[16]  The Pennsylvania Supreme Court defined

willful misconduct, for the purposes of tort claims, to mean "that the actor desired to bring about

the result that followed, or at least that he was aware that it was substantially certain to ensue."

Evans v. Phila. Transp. Co., 212 A.2d 440, 443 (Pa. 1965) (cited in Renk, 641 A.2d at 293).

    The elements of false imprisonment are largely the same as for false arrest under

Pennsylvania law: the detention of another that is unlawful.  Manley v. Fitzgerald, 997 A.2d

1235, 1241 (Pa. Cmwlth. 2010).   To prevail, Marcavage would have to show that Lt. Stanford

acted with willful misconduct.  The brief snippet of the video the City provided as Exhibit D

shows no such thing.  Lt. Stanford asks Marcavage to turn off the video, and he refuses to do so.

After Lt. Standford states he will confiscate the camera, the video is stopped.  As the defendants

persuasively argue, the video provides objective evidence that Marcavage disobeyed a police

order.  Lt. Stanford never sought to seize the camera.  Because Lt. Stanford did not arrest

Marcavage, Marcavage cannot make out the indispensable element of a malicious prosecution

claim -- that proceedings were instituted against him.

    Fleck has no tort claim against the City or Lt. Stanford because he was not told to leave

the area.

    We will therefore grant summary judgment to the City defendants on plaintiffs' state tort

claims.

---

[16] Under 42 Pa.Cons.Stat. Ann. §§8542(b), a plaintiff may recover against a local agency or its employee for acts in one of the following eight categories: (1) Vehicle liability;  (2) Care, custody or control of personal property;  (3) Real property;  (4) Trees, traffic controls and street lighting; (5) Utility service facilities;  (6) Streets;  (7) Sidewalks; and (8) Care, custody or control of animals.

>       **5.**       <u>**Monell Claim Against The City Of Philadelphia**</u>

Finally, plaintiffs make generalized allegations that the City of Philadelphia had a custom, policy or practice of suppressing religious speech in all public forums.  Defendants assert that plaintiffs were not subjected to any constitutional violation and therefore cannot sustain their municipal liability claim against the City.  They further contend that plaintiffs cannot prevail because they have not adduced any evidence of a failure to train that resulted in speech suppression or unlawful seizure.

We need not reach defendants' second point to find that plaintiffs cannot prevail here. Again, we must consider the merits of the City's unopposed summary judgment motion by drawing all reasonable inferences in favor of the plaintiffs and without making credibility determinations or weighing the evidence.  <u>See</u> <u>Reeves</u>, 530 U.S. at 150.   For plaintiffs to prevail against the City, there would have to be a valid underlying constitutional injury.  As our Court of Appeals held in <u>Grazier ex rel. White v. City of Philadelphia</u>, 328 F.3d 120 (2003), "[t]here cannot be an award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." <u>Id.</u> at 124 (quoting <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986)).  And of course to prevail under Section 1983 against a municipality the plaintiffs must show that the municipality itself caused the underlying constitutional violation through the implementation of a custom, policy or practice.  <u>See</u> <u>Monell</u>, 436 U.S. at 693.

Because we find that there has been no underlying constitutional violation here, plaintiffs cannot prevail in a custom, policy or practice claim against the City.  We will therefore grant summary judgment to the City on this claim. We will also dismiss all claims against the named defendant Sergeant Harrison, against whom plaintiffs made no specific factual allegations.

34

Plaintiffs also seek to enjoin the City from enforcing a policy of suppressing religious speech in public forums.  But the record is devoid of any evidence that such a policy exists and thus there is nothing to enjoin.

**IV.**     **<u>Conclusion</u>**

For the reasons cited above, the motions for summary judgment of the Penn defendants and the City defendants will be granted.

BY THE COURT:

<u>/S/ STEWART DALZELL, J.</u>